## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

FAIR HOUSING CENTER OF  | Case No. 1:18-cv-1098
CENTRAL INDIANA, INC.; LIZETH |
AZCARRAGA; JORGE CACERES; |
ROMARY VAZQUEZ; NICOLE  |
ANAYA; PAULA ALMANZA; and |
SARAHI GUADARRAMA;   |
          |
 Plaintiffs,      |
          |
 v.         |
          |
MARSHALL WELTON; BURGER |
PROPERTY ASSURANCE LLC;  |
HOOSIER COLLINS COMMERCIAL |
STRATEGIES LLC; SLB    |
ACQUISITIONS LLC; SLB ASSETS II |
LLC; SLB ASSETS III LLC; SLB  |
INVESTMENTS LLC; NATALIA  |
VILLANUEVA; and JUAN ENRIQUEZ, |
          |
 Defendants.     |
          |

## COMPLAINT; JURY TRIAL DEMAND

## I.  INTRODUCTION

1. Plaintiffs – Latino tenants with purchase options or land contracts,

and Indiana's fair housing center – sue the owners and operators of "Casas Baratas

Aqui" – their landlord, lender, mortgagee, vendor, and seller – for discrimination

in violation of the Fair Housing Act, Equal Credit Opportunity Act and Civil Rights Acts and for unlawful practices in violation of the Truth in Lending Act, and related, supplemental state law claims.

## II.  JURISDICTION AND VENUE

2.     This Court has subject-matter jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343**,** 42 U.S.C. § 3613, 15 U.S.C. § 1640(e) and over their state-law claims under 28 U.S.C. § 1367 because those state law claims arise from the same facts, occurrences and transactions as their federal law claims.

3.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because the events alleged in this complaint occurred in Marion County, Indiana.

## III.  PARTIES

4.     Plaintiff Fair Housing Center of Central Indiana, Inc. is a private, nonprofit Indiana corporation dedicated to eradicating housing discrimination in Indiana through fair housing education, outreach, counseling and enforcement. It is the only private, nonprofit fair housing agency serving Indiana. Its offices are located in Indianapolis. Since 2016, the Fair Housing Center has diverted significant staff time and resources to investigate Casas Baratas Aqui in response to the concerns of local community development corporations and the complaints of victims injured by defendants' discriminatory and unlawful practices.

5.     Plaintiff Lizeth Azcarraga, 26, occupies a single-family dwelling located at 65 South Lynhurst Drive in Indianapolis with her two children.

Azcarraga is Hispanic[1]; she immigrated from Mexico to the United States in 2008. Azcarraga is a monolingual Spanish speaker.

      6.    Plaintiff Jorge Caceres, 47, occupies a single-family dwelling located at 407 South Somerset Avenue in Indianapolis with his wife and three minor children. Caceres is Hispanic; he immigrated from El Salvador to the United States in 1996. Caceres is a monolingual Spanish speaker.

      7.    Plaintiff Romary Vazquez, 33, occupies a single-family dwelling located at 6 Mellon Court in Indianapolis with her husband and minor child. Vazquez is Hispanic; she migrated from Puerto Rico to Indianapolis in 2011. Vazquez's native and principal language is Spanish.

      8.    Plaintiff Nicole Anaya, 32, occupies a single-family dwelling located at 1437 South Kiel Avenue in Indianapolis with her husband and two children. Anaya is Hispanic; she migrated from Puerto Rico to Indianapolis in 2009. Anaya's native and principal language is Spanish.

      9.    Plaintiff Paula Almanza, 40, occupies a single-family dwelling located at 1601 North Pasadena Street in Indianapolis with her husband and four

---

[1]The terms Hispanic and Latino are used interchangeably in this complaint. The U.S. Office of Management and Budget (OMB) requires federal agencies to use a minimum of two ethnicities in collecting and reporting data:  Hispanic or Latino and Not Hispanic or Latino. OMB defines "Hispanic or Latino" as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race. People who identify with the terms "Hispanic" or "Latino" are those who classify themselves in one of the specific Hispanic or Latino categories listed on the decennial census questionnaire and various Census Bureau survey questionnaires – "Mexican, Mexican Am., Chicano" or "Puerto Rican" or "Cuban" – as well as those who indicate that they are "another Hispanic, Latino, or Spanish origin."

children. Almanza is Hispanic; she immigrated from Mexico to the United States in 2001, moving to Indianapolis in 2005. Almanza is a monolingual Spanish speaker.

10.    Plaintiff Sarahi Guadarrama, 33, occupies a single-family dwelling located at 3237 Gerard Avenue in Indianapolis with her husband and four children. Guadarrama is Hispanic. She immigrated from Mexico to the United States in 2001, moving to Indianapolis in 2008. Guadarrama is a monolingual Spanish speaker.

11.    Defendant Marshall Welton, 57, owns, operates and manages a collection of limited liability companies doing business as "Casas Baratas Aqui" (Casas Baratas or Casas), a trade name under which Welton advertises houses for rent-to-buy in Indianapolis. Welton is sued in his personal capacity and as the manager or president of the defendant LLCs listed below.

12.    The defendant LLCs are:  Burger Property Assurance LLC, Hoosier Collins Commercial Strategies LLC, SLB Acquisitions LLC, SLB Assets II LLC, SLB Assets III LLC, and SLB Investments LLC.  Welton is the manager of each defendant LLC.

13.    Defendant Natalia Villanueva, 40, is employed by Welton through one or more of the defendant LLCs controlled by Welton.

14.    Defendant Juan Enriquez, 38, the husband of Natalia Villanueva, is employed by Welton through one or more of the defendant LLCs controlled by Welton.

-4-

15.    Each defendant is the principal, agent, partner, co-venturer, or co-conspirator of each other defendant. Each defendant is vicariously liable for the injuries caused by each other defendant.

## IV.  FACTS

### A.  Indianapolis Housing Market

16.    The Indianapolis housing market is big and complex. Its two most striking features are the high percentage of single-family houses that comprise the city's housing stock and the number and prevalence of abandoned houses.

17.    The city's housing stock consists mostly of single-family, detached dwellings. Although housing tenure among city residents is split evenly between owner occupied (53%) and renters (47%), most residents of Indianapolis live in single-family homes, which comprise 72% of the city's total occupied dwellings. (Table DP04, American Community Survey [ACS] 2012-2016.)   These single-family neighborhoods contain the greatest percentage of the city's abandoned dwellings. See *Vacancy and Abandonment in the City of Indianapolis, Indiana* (Center for Community Progress 2016).

18.    The city's effort to address the number and growth of abandoned houses started in earnest in 2003, when Mayor Bart Peterson announced "war" on abandoned houses in his 2003 "State of the City" address. Peterson established an Abandoned Houses Working Group, which issued a report entitled *Reclaiming Abandoned Property in Indianapolis* in 2004. *Reclaiming* summarized the history of the abandoned houses problem, starting with displacement caused by highway

construction in the 1960s, misguided urban renewal projects in the 1970s, and white flight to the suburbs outside Marion County.

19.     *Reclaiming* pointed to past efforts by the city to curtail the number of abandoned houses. In the 1980s, Mayor Hudnut created the Indianapolis Neighborhood Housing Partnership to extend credit and support for the purchase and repair of houses in the neighborhoods most adversely affected by abandonment. In the 1990s, Mayor Goldsmith enlisted the Lilly Endowment to create 14 community development corporations serving the city's hardest hit neighborhoods. That effort got a boost after 1992 when HUD started funding the city under the HOME program to finance the creation and preservation of affordable housing. More HUD money followed, enabling the city to establish a Home Ownership Zone, which funded the construction of Fall Creek Place.

20.     Armed with the *Reclaiming* report, Mayor Peterson poured more money into stabilizing the city's poorer neighborhoods and went to the legislature with an ambitious agenda of fixes to empower Indianapolis to reduce the number of abandoned houses. The city's efforts were met with some success. The median price of a home in Indianapolis peaked in 2006.

21.     But nothing could prepare Indianapolis for the fallout in the wake of the 2008 housing meltdown. Census data tells part of the story.

22.     In 2000, Indianapolis had 352,000 housing units; 32,000 were vacant. (Table QT-H1, SF 1 2000.)  Of the city's vacant dwellings, a full 27%, totaling 8,769 dwellings, could not be classified by the Census as either "available for

rent" or "available for sale." (Id.) By 2010, Indianapolis had 379,000 housing units; 47,000 of which were vacant. (Table QT-H1, SF 1 2010.) Of the city's vacant dwellings 36%, totaling 17,322 dwellings, could not be classified by the Census as either "available for rent" or "available for sale." (Id.) The most recent census data reports that Indianapolis has 382,055 housing units:  331,687 occupied and 50,368 vacant. (Table DP04, ACS 2012-2016.)

23.     Although Indiana has experienced a high rate of foreclosures since the 1990s, *Hoosier Inhospitality: Examining Excessive Foreclosures Rates in Indiana*, 39 Indiana Law Review 87 (2005), Indianapolis was particularly devastated by the national housing market meltdown.

24.     The number and rate of foreclosure cases filed in Marion County illustrate the depth of the housing crisis experienced by Indianapolis. In 2003, the Marion County Clerk reported that 6,892 mortgage foreclosure actions had been filed. That number climbed to 7,013 in 2004 and kept climbing: 7,782 in 2005; 9,351 in 2006; 10,035 in 2007; 9,452 in 2008; 8,861 in 2009; and 8,070 in 2010. By 2011, foreclosure filings dropped below their 2003 level, totaling 5,432, and continued dropping to 4,077 in 2013. But as foreclosures slowed, the number of abandoned houses increased. In 2013, RealtyTrac data showed that Indianapolis had the highest rate of abandoned houses of any major city in the United States. 24/7 Wall St. reported that "[n]early one in three homes in foreclosure are abandoned in Indianapolis." (http://247wallst.com [6/22/2013].)

//

### B.  Latino immigration to Indianapolis

25.    While many residents abandoned Indianapolis, an increasing number of Latino families moved to the city and made it home. The Census tells part of the story. In 1990, Latinos made up less than 1% of Indianapolis's total population. (Hispanic Trends, Pew Research Center 2016). In 2000, Latinos made up 3.6% of the city's total population, occupying 2.6% of Indianapolis's homes (Table QT-P3, SF 1 2000). By 2010, that percentage had climbed three-fold to 9.4% of the city's total population; Latino families occupying 6% of the city's dwellings (Table QT-H1, SF 1 2010). The Census estimates that today a full 10% of Indianapolis's residents are Hispanic or Latino (Table DP05, ACS 2012-2016).

26.    For the most part, Indiana and Indianapolis welcomed Latino families. In 2003, the State Legislature created the Commission on Hispanic/ Latino Affairs, which reports to legislative leaders and the governor about challenges facing Latinos immigrating to Indiana. In Indianapolis, Mayor Ballard created a portfolio among his senior staff to address Latino issues. Even Governor Pence embraced the new comers. In his first year as governor, Pence hosted the inaugural luncheon of the Indiana Latino Institute, celebrating the mission and founding of the new institute. Pence wowed the gathering, recounting his own family's immigration saga and his deep commitment to immigration reform. As a former congressman, he told the luncheon about pressing President Bush in 2006 to pursue immigration reform. "I told the President that my commitment stems from the day in October 1919 when my 19-year old grandfather, Richard Michael

Cawley, got off a boat on Ellis Island. I said to him, 'We're a nation of immigrants. I don't just get it. I lived it," Pence proclaimed. *(Gov. Mike Pence's immigrant heritage influences his actions, he tells Latino Institute*, Indianapolis Star [9/20/2013].)

27.    As Pence's views on Latino immigration evolved over the next three years, defendant Marshall Welton was going through a process of evolution as well.

### C.  Defendant Marshall Welton's Real Estate Businesses

28.    Marshall Welton, formerly a licensed Indiana attorney, is in the business of buying, selling and renting real estate. By 2004, Welton had amassed a large portfolio of low-cost, run-down and mostly abandoned houses in Indianapolis. He had also attracted considerable controversy.

29.    In June 13, 2002, WTHR Channel 13 Eyewitness News broadcasted an investigative report, *Where's Our Money?*, examining landlords who failed or refused to pay county property taxes on their properties. The broadcast focused on Welton as an illustration of the problem, reporting that he owned more than 100 properties and owed the county nearly $39,000 in back property taxes. The story's closing remarks bite:

> "And remember Marshall Welton? He hadn't paid all his taxes, but apparently not for lack of money. One day after we talked to him, we found him at the City-County Building – not to pay his taxes, but to buy even more property at a county-run foreclosure sale."

30.     Undeterred by bad press, Welton tapped over five million dollars in credit lines from The National Bank of Indianapolis and First Indiana Bank to expand his rental home portfolio soon after the WTHR broadcast.

31.     For Welton, however, 2004 brought more bad news. The Mayor's Abandoned Houses Work Group included Welton in its 2004 Top Ten List of problem property owners. Then, in 2006, county prosecutors charged Welton with forgery in connection with an alleged real estate scam, but dismissed the charges in 2007. Then came the *IndyStar* investigation.

32.     On Sunday, April 15, 2007, the Indianapolis Star ran a front page story, *Open for Fraud*, that described the key players involved in one alleged mortgage scam, tracing a home loan's path from origination to securitization by Lehman Brothers. The story covered the front page and prominently featured a photograph of Welton and others allegedly involved in the scam.

33.     After 2007, Welton branched out and lowered his personal profile. In 2009, he founded AppealTaxes-NOW, a business that appeals property tax bills and assessments on behalf of real estate investors. In 2016, he announced the expansion of the business to 10 states, starting with Georgia. On the company's website, Welton provides his bona fides:

> Having a Masters in Business Administration coupled with a Law Degree, Marshall Welton is an incredible asset to our AT-N team. His education paired with his years of experience in real estate makes him a trusted assessor and property portfolio manager. To date, Welton has built, managed and overseen the portfolios of over 850 properties. Welton also oversees day to day operations of the AT-N's partners' real estate portfolio and has grown their various real estate entities

into a multi-million dollar portfolio. Marshall's commitment to professionalism and his mastery of real estate and appeals knowledge make him a remarkable team member and appeals professional who works hard to make sure our client's aren't overpaying on their property taxes.

34.    Welton continued to operate his growing portfolio of dilapidated, abandoned houses throughout Indianapolis, selling some, renting others, and foreclosing and evicting hundreds of families from their homes. A review of the state court dockets via the Odyssey case management system shows that between 2000 and 2017, Welton, acting in his own name as landlord, filed 169 eviction cases. This survey does not include evictions that may have been filed in the names of the many limited liability companies controlled by Welton.

35.    Starting in 2008, with the help of local attorney Grover Davis,[2] Welton created a maze of limited liability companies among which he transferred his dilapidated houses. Defendants Burger Property Assurance LLC, Gemini Investments LLC, and Wong Ventures, LLC were the first. In 2012, Welton and Davis added CND Cuzco Ventures LLC, followed by Asset & Equity Strategies LLC in 2013, 8M LeBaron LLC and ATN Investments LLC in 2014, and Plus One Enterprises LLC in 2016. Welton was designated as manager for each of the LLCs.

---

[2]Grover Davis is not named as defendant, though public records indicate that he may have involvement in Welton's rent-to-buy scheme beyond that of an ordinary attorney-client relationship. He is apparently part owner of at least one of the houses marketed by Casas Baratas.

36.     Meanwhile, Welton was again charged with crimes arising out of alleged financial improprieties related to real estate, but was found not guilty in 2011.

37.     In 2015, Welton fully launched the scheme at the heart of this lawsuit. That scheme exploits two social forces dominating the Indianapolis housing market now and for the foreseeable future – the persistence of the city's large stockpile of abandoned houses, *Vacancy and Abandonment in the City of Indianapolis, Indiana* (Center for Community Progress 2016), and the growing demand from Indy's Latino families for a piece of the American Dream, *New Americans in Indianapolis* (New American Economy 2016).

38.     Welton built his predatory scheme based on the very same observations that scholars and housing advocates had warned regulators about for decades:  The vulnerability of the Latino community to exploitation by predatory housing and lending practices that flourish due to their isolation by language, citizenship, and lower incomes.

### D.  Language, National Origin, and Predation

39.     Latinos account for the vast majority of Spanish speakers in the United States and, in turn, the vast majority of Latinos in the United States speak Spanish. This is a significant proportion of the country's total population. *Language Use in the United States* (ACS Reports 2011). National origin and race based on Latino or Hispanic status is coextensive and inseparable from reliance on Spanish as a person's principal language. Of the Spanish speakers in the United

States, 92% are Latino or Hispanic. (*Language Projections: 2010-2020* [Census 2011].)  Among Latinos residing in the United States, only 4% used English as their principal, preferred language; the rest rely on Spanish. (Id.)

40.    As Latino home seekers enter the mortgage and home buyer markets, they confront discrimination. *Housing Discrimination against Racial Minorities 2012* (HUD PDR 2013) (Data collected from 8,000 paired fairing tests conducted in 2012 in 28 cities showed that Latino home seekers still confront significant discrimination in the rental or sale of housing.). Lenders disproportionately deny or offer only subprime loans to Latino borrowers. *Jeopardizing Hispanic Home Ownership: Predatory Practices in the Home Buying Market* (National Council of La Raza, 2005). Fair housing testing and document review confirm that these outcomes cannot be fully explained by nondiscriminatory considerations. (Id.) Pervasive discrimination in the established credit markets forces Latino borrowers to seek alternative home financing from "locally driven, highly-unregulated entities whose sole purpose is to target vulnerable and unsophisticated borrowers who are unlikely or unable to complain." (Id.) Welton and his flotilla of defendant LLCs are one example of those "locally driven, highly-unregulated entities whose sole purpose is to target vulnerable and unsophisticated borrowers who are unlikely or unable to complain."

41.    For unregulated lenders, like Welton, there are at least two common predatory practices that have been proven successful in exploiting Latino families.

a.  First, there is the language barrier. Overwhelmingly, predatory practices

targeting Latino families rely on forms and contracts written in English, since very few state consumer protection laws mandate translation. *Consumer Protection for Latinos: Overcoming Language Fraud and English-Only in the Marketplace*, 45 Amer. U. L. Rev. 1027, 1996. Unscrupulous businesses exploit this vulnerability; the FTC estimated that the language barrier plays a significant role that caused 14% of all Latino families in the United States to experience some form of consumer fraud in 1994, *Consumer Fraud in the United States: An FTC Survey*, (FTC 2004), a problem that persists today, *Combating Fraud in the African American and Latino Communities* (FTC 2016) ("Certain scams deliberately target the Latino community by using Spanish language marketing, and the FTC has brought aggressive law enforcement actions.").

b.  Second, there is "affinity fraud," the practice of using other Spanish speakers to ensnare Latino families in predatory deals. To exploit the language barrier – and build trust where traditionally consumer protection rules provide no protection – businesses rely on Latino employees in key positions to serve as the public face of their business and principal points of contact with consumers. *Consumer Fraud and Latino immigrant consumers in the United States*, International Journal of Consumer Studies, 2005.

42.     Throughout 2015, Welton took full advantage of these tactics. Under his trade name, Casas Baratas Aqui ("Cheap Houses Here"), he successfully enticed Latino home seekers into predatory rent-to-buy deals to soak up his huge

inventory of uninhabitable, abandoned houses. The scheme proved so successful that Welton wanted to expand his operation, dominating the Latino single-family housing market with his predatory practices. But to get to the next level, Welton needed to find lenders who understood his business model. Two California lenders, CoreVest and American Homes 4 Rent, who specialize in funding real estate investors like Welton, were willing to help.

### E.  A Twenty Million Dollar Business Plan

43.     From a traditional lender's perspective, Welton might have been seen as a risky borrower who lacked the requisite state licenses to execute his plan. Over the past decades, banks and creditors filed 11 lawsuits against Welton for breach of his loan obligations. Welton's lenders also had filed at least 18 foreclosure actions seeking to collect against the properties he had pledged as collateral. Whether Welton was *ever* licensed by the Indiana Department of Financial Institutions or Indiana Real Estate Commission cannot be determined from public records, but there is no public record of him holding any of the required licenses to deal in mortgage lending or real estate since January 1, 2017. Nonetheless, by the end of 2017, Welton had amassed more than twenty million dollars to expand his  operations.

44.     To get these loans, Welton first needed to establish several new, clean LLCs. Over the next year, Welton created several new LLCs to act as his borrowers. On December 5, 2016, Welton filed articles with the Delaware Secretary of State for the creation and establishment of SLB Acquisitions LLC, of

which Welton is the manager. On January 8, 2017, Welton filed articles with the Indiana Secretary of State for the creation and establishment of SLB Investments LLC, of which Welton is the manager. On February 28, 2017, Welton filed articles with the Delaware Secretary of State for the creation and establishment of SLB Assets LLC, of which Welton is the manager. As needed, Welton added more: On September 14, 2017, Welton filed articles with the Delaware Secretary of State for the creation and establishment of SLB Assets II LLC and SLB Assets III LLC.

45.    Next, Welton leveraged his control over his older LLCs to transfer their houses to his newly minted LLCs. In a blizzard of property transfers, Welton aggregated hundreds of houses held in the names of SLB Acquisitions LLC, SLB Assets II LLC, SLB Assets III LLC, and SLB Investments LLC.

46.    Next, Welton applied for – and remarkably obtained – massive lines of credit from two California lenders.

47.    In December 2016, Colony American Finance Lender, LLC – renamed CoreVest American Financial Lender LLC last July[3] – loaned Welton's SLB Acquisitions LLC the sum of $12,500,000. To secure that loan, Welton

---

[3]CoreVest emerged from the remains of Colony after Fortress Funds purchased Colony's equity and assets in 2017. Fortress lent back funding for Colony to reinvent itself as CoreVest, shedding its REIT status and operating as a privately-held lender that specializes in the single-family rental residential market. CoreVest caters to borrowers who either acquire portfolios or investors who purchase properties and require bridge loans to make investments to upgrade those properties, and then flip those properties in the short term.

mortgaged more than 100 houses in January 2017, including the dwelling occupied by plaintiff Nicole Anaya.

48.     To further secure that same loan, Welton mortgaged more houses to Colony, now CoreVest, in August 2017 and again in September 2017, including the dwelling occupied by plaintiff Jorge Caceres.

49.     In October 2017, Welton went back for more money. CoreVest loaned $3,800,400 to Welton's SLB Assets II LLC, secured by more houses, including the dwelling occupied by plaintiff Lizeth Azcarraga.

50.     In December 2017, CoreVest loaned $4,699,400 to Welton's SLB Assets III LLC, secured by another raft of mortgaged houses, including the dwelling occupied by plaintiff Nicole Anaya, originally mortgaged in January 2017 to Colony.

51.     Welton tapped other lenders as well. In February 2017, American Homes 4 Rent loaned seven million dollars to Welton's SLB Investments LLC. To secure that loan, Welton mortgaged 384 houses, including the home occupied by Sarahi Guadarrama.

52.     CoreVest did not hold Welton's mortgages for long. In December 2017, CoreVest assigned its security interest in the Welton mortgages to Wilmington Trust, National Association, as Trustee for the benefit of the Holders of CoreVest American Finance 2017-2 Trust Mortgage Pass-Through Certificates. CoreVest pooled Welton's debt with that of other investors into a $202 million dollar structured transaction, CAFL 2017-2. Then, in a stroke of very good

fortune, GSE FreddieMac agreed to roll up 80% of the CoreVest certificates in its FRESR 2017-SR01 offering as part of Freddie's new pilot program to facilitate buy-to-rent investor portfolio lending in the single-family housing market.

### F.  "Casas Baratas Aqui"

53.    Flush with cash, Welton needed to perfect two more steps before taking his scheme to the next level.

54.    First, he needed to purchase more low-cost houses to fuel his rent-to-buy mill. Almost without exception, the hundreds of houses purchased by Welton had been foreclosed, then abandoned, then fallen into substantial disrepair; none complied with state or city health and safety codes, a situation that Welton was very familiar with. Since 2002, Welton had been sued several times by Marion County for renting houses that were uninhabitable.

55.    Next, Welton needed to perfect a transaction that deprived customers of virtually every possible state law protection while it gave him every possible advantage. The result is a transaction that is inherently contradictory since it treats customers as tenants when that treatment benefits Welton, and treats them as owners when that treatment benefits Welton.

56.    Welton's perfected transaction consists of three documents executed in two stages. In the first stage, Latino customers are required to execute a one-year lease agreement and a purchase option; each document cross-references the other. Both are in English and no written translation of either document is provided to Latino customers. In fact, the only Spanish language document

provided by Welton to his Latino customers is a one-page instruction sheet outlining how to pay their rent to Welton.

### 1. The lease

57.    The lease identifies the customer as a tenant, but imposes upon the tenant the duty to pay Welton's real estate taxes, assessments, and insurance for the dwelling, a void provision since it is the duty of Welton as owner to pay those expenses. Ind. Code §§6-1.1-4-1, 6-1.1-2-4.

58.    The lease states that Welton is renting the property "as is," disclaiming any responsibility to "make repairs, improvements, or otherwise maintain the property in any manner," a provision that violates Welton's non-waivable obligation under Indiana Code §32-31-8-4, to –

> (1) Deliver the rental premises to a tenant in compliance with the rental agreement, and in a safe, clean, and habitable condition.
>
> (2) Comply with all health and housing codes applicable to the rental premises.
>
> (3) Make all reasonable efforts to keep common areas of a rental premises in a clean and proper condition.
>
> (4) Provide and maintain the following items in a rental premises in good and safe working condition, if provided on the premises at the time the rental agreement is entered into:
>
>> (A) Electrical systems.
>>
>> (B) Plumbing systems sufficient to accommodate a reasonable supply of hot and cold running water at all times.
>>
>> (C) Sanitary systems.

(D) Heating, ventilating, and air conditioning systems. A heating system must be sufficient to adequately supply heat at all times.

(E) Elevators, if provided.

(F) Appliances supplied as an inducement to the rental agreement.

Ind. Code §32-31-8-5.

59.    The lease also states that the "tenant shall be solely responsible to/for compliance with all applicable building and health code laws and regulations," another void provisions since it is the duty of Welton as landlord to ensure building and health code compliance. Ind. Code §§16-41-20-8, 32-31-8-5.

60.    The lease imposes a duty on the tenant to "return the premises and all furnishings provided by the Landlord in a clean, sanitary condition at the end of the lease," another void provision since none of the houses rented or sold by Welton are "clean or sanitary" at the commencement of occupancy. Ind. Code §§32-31-7-6, 32-31-8-5.

61.    The lease imposes on the tenant a duty to repair and maintain the dwelling up to health and building code standards and to return the dwelling in a "clean, sanitary condition," but expressly provides that the "tenant shall not claim for reimbursement from landlord for any expenditure with regard to the property, and tenant hereby waives and shall be prohibited from making any claim against landlords based upon a purported increase in the value of the property by virtue of repairs or reasonable value of improvements made by tenant."

62.     The lease provides that Welton may cancel the lease, requiring a tenant to surrender possession of the dwelling within five days, and that Welton may keep the value of any payments made under the purchase option part of the transaction, the value of the tenant's improvements, and the costs of evicting the tenant, a violation of state law, as discussed below.

63.     The lease also provides that Welton may assign or mortgage the lease without any notice to the tenant, even if the tenant has made a down payment pursuant to the purchase option, a violation of state law discussed below.

### 2. The purchase option

64.     In the first stage of the transaction, Latino customers are also required to execute a purchase option, written in English. The purchase option states the purchase price of the dwelling and requires the customer to pay a down payment – typically calculated as 10% of the purchase price. The purchase option characterizes this down-payment as a both "non-refundable option fee" and as a "down-payment."

65.     The customer is required to pay an installment of the down payment at the time the customer executes the lease agreement. During the lease period of one year, the customer is required to pay the balance of the down payment during the lease term or forfeit any payments made. If the customer fulfills her obligation under the lease and under the purchase option, then Welton promises to provide the customer a "land contract."

66.    The purchase option agreement reaffirms the void provisions in the lease:

a.  that real estate taxes, municipal assessment and insurance "during the lease portion" of the contract option shall be the customer's sole responsibility;

b.  that the dwelling is leased and optioned "as is;"

c.  that Welton has no obligation to make repairs, improvements, or otherwise maintain the dwelling in any manner;

d.  that the customer is solely responsible for compliance with building and health regulations; and,

f.  that if Welton makes any repairs to the dwelling, that the customer must pay for the cost of those repairs or Welton will add that cost to the total purchase price.

67.    If the customer shirks any obligations under these void provisions, then Welton may cancel the lease and the purchase option, keeping the value of any repairs or improvements made by the tenant and any down-payment paid by the tenant.

### 3. The "land contract"

68.    The second stage of the transaction is the execution of the third document, a "land contract." This stage occurs only after the tenant has paid the full down-payment by the end of the lease term. Since Welton's predatory scheme was not robustly implemented until 2017 – and under his rent-to-buy scheme a

purchaser typically has the one-year lease period to pay the down payment – very few land contracts have actually been executed between Welton and his Latino customers. Of the contracts that have been executed and recorded, several uniform provisions appear:

a.  Each land contract follows a standard form and format, running seven pages of small, English-only print.

b. Welton, acting through a defendant LLC, is the vendor; the customer is the purchaser.

c.  The contract states the purchase price, down-payment amount, interest rate, monthly installment payment, and term of the loan in years.

d.  Each land contract imposes an APR of 10%, which qualifies each land contract as a "higher priced loan transaction" under the Truth in Lending Act, 12 C.F.R. § 1026.43(b)(4).

e.  Welton warrants in each contract that he "has good and merchantable title to the Real Estate, free and clear of any and all liens, leases, restrictions and encumbrances, except . . . for easements and restrictions of record as disclosed in the Title Commitment," though he never provides customers with any title commitment.

69.    If the purchaser pays Welton in full, then Welton agrees to convey the property to the purchaser, subject only to easement and restrictions of records as of the date of contract. But that promise is not performable. Welton has retained the right to encumber the property with a mortgage and has freely and widely

exercised that right, pledging houses subject to his rent-to-buy or land contracts as collateral to secure the CoreVest and American Homes 4 Rent mortgages. Although Welton promises that any such mortgage will be subordinate to the land contract, he provides purchasers with no subordination agreement (and unlikely has the power to extract such an agreement from CoreVest or American Homes 4 Rent). Welton also authorizes the purchaser to cure any mortgage default by Welton and to deduct the cure costs from the purchase price of their homes, which as a practical matter is completely illusory, since purchasers lack any ability to cure any default on Welton's massive loans.

70.    Welton certainly recognizes the risk associated with the power to encumber a property since he expressly prohibits the purchaser from encumbering the property with a mortgage.

71.    Whether Welton will (and can) actually honor the terms of these land contracts, providing purchasers with a marketable title after their payment of inflated prices for uninhabitable homes at high interest rates is questionable. His authority to secure a subordination agreement from CoreVest or American Homes 4 Rent, which should have been obtained and recorded prior to execution of the land contract, is dubious. His track record of honoring his obligations is suspect. And since none of the land contracts have matured, there is no record of past performance from which to infer whether purchasers will ever obtain the benefit of these predatory bargains.

72.    A review of Marion County's records for Welton's land contracts shows that before 2017, the defendant LLCs had executed only four land contracts, each with a Latino family. Since 2017, Welton has executed 17 recorded contracts, all but one executed by SLB Investments LLC, as follows (sorted by contract date):

| *LLC* | *Purchasers* | *Contract Date* | *Recording Date* |
|-------|-------------|-----------------|------------------|
| ATN Investments | Camillo-Lopez, Jose; Parra-Lopez, Gloria | 01/15/2017 | 03/17/2017 |
| SLB Investments | Guzman, Gloria; Guzman, Demetrio | 02/27/2017 | 12/20/2017 |
| SLB Investments | Penaloza, Karen; Castro, Froylan | 03/30/2017 | 03/09/2018 |
| SLB Investments | Navarrete, Felix | 04/1/2017 | 01/24/2018 |
| SLB Investments | Diaz, Mosquea; Chirinos, Francisco | 04/1/2017 | 03/02/2018 |
| SLB Investments | Clemente, Galindo; Ramos, Migdalia | 05/1/2017 | 11/27/2017 |
| SLB Investments | Caceres, Jorge; Rodriguez, Vilma | 06/15/2017 | TBD |
| SLB Investments | Suchite, Imelda; Garcia, Pascual | 07/1/2017 | 01/05/2018 |
| SLB Investments | Alvarado, Lesvia;  Varela, Amilcar | 07/01/2017 | 01/26/2018 |
| SLB Investments | Marroquin, Maria; Ferrufino, Roman | 07/10/2017 | 11/27/2017 |
| SLB Investments | Ortez, Luis; Castillo, Glenda | 07/31/2017 | 12/15/2017 |

| LLC | Purchasers | Contract Date | Recording Date |
|---|---|---|---|
| SLB Investments | Lazaro, Valentin; Hernandez, Pablo | 08/01/2017 | 12/28/2017 |
| SLB Investments | Marquez, Mileybis; Caceres, Sergio | 08/28/2017 | 01/30/2018 |
| SLB Investments | Caceres, Marta; Lopez, Refugio | 09/15/2017 | 12/19/2017 |
| SLB Investments | Berrahi, Mohamed; Szurkiewicz, Katarzyna | 09/25/2017 | 12/15/2017 |
| SLB Investments | Morales, Rafael; Hernandez, Maria | 11/17/2017 | 12/28/2017 |
| SLB Investments | Andrade, Carlos; Herrera, Edith | 12/01/2017 | 01/22/2018 |

73.    Except for the Berrahi family, every other land contract purchaser was Latino.

74.    During the course of these rent-to-buy transactions – lease, purchase option, land contract – defendants never take any steps to comply with TILA's higher priced loan requirements, including but not limited to:

a.  Making a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms, in violation of 15 U.S.C. § 1639c(a) and 12 C.F.R. § 1026.43(c);

b.  Receiving written certification that each consumer has obtained counseling on the advisability of the transaction from an appropriate

-26-

counselor, in violation of 15 U.S.C. § 1639(u) and 12 C.F.R. § 1026.34(a)(5);

c.  Providing a written disclosure stating: "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan," in violation of 15 U.S.C. § 1639(a) and 12 C.F.R. § 1026.32(c); and,

d.  Providing each consumer with a written appraisal performed by a certified or licensed appraiser in violation of 15 U.S.C. § 1639h and 12 C.F.R. § 1026.35(c)(6).

## G.  "NO Verificamos Crédito ~ NO Necesitas SSN ~ Renta a Compra"

75.    Welton could not execute his predatory scheme without defendant Natalia Villanueva, a Latina and native Spanish speaker, who serves as the face of Casas Baratas and the voice that convinces Latino customers to sign Welton's English-only documents. *The Magic of Group Identity: How Predatory Lenders Use Minorities to Target Communities of Color*, 17 Geo. J. on Poverty L. & Pol'y 165(2010) (Unscrupulous merchants commonly rely on native speakers, like Villanueva, to execute affinity fraud). Welton also brought on board Villanueva's husband, defendant Juan Enriquez, who works outside the office as Welton's eyes and ears and, as needed, his enforcer.

76.    Over the past two years, Casas Baratas has pursued one of the most aggressive Spanish language advertisement campaigns in Indianapolis, saturating every Spanish language media outlet with its message, "cheap houses ~ rent to buy." The campaign has successfully funneled hundreds of Latino customers to Villanueva where she convinces them to trust her brief explanation of Welton's English-only documents and submit to his predatory rent-to-buy transactions.

77.    Casas Baratas taps every Spanish language media outlet reaching virtually every Latino household in Indianapolis. It places a pair of yard signs throughout the city's neighborhoods and in front of Casas Baratas houses for rent-to-buy:



78.    Its standard sign uses the colors of the Mexican flag – green, white, and red – and features a cactus and sombreros, images that have become the trade dress for Casas Baratas. The yellow sign translates to "rent to buy." The telephone number – 771-6941 – is Villanueva's cell phone number.

79.    Casas Baratas also advertises on Radio Latina, 107.1 FM, the most popular Spanish language radio station broadcasting in Indianapolis. Its DJ personalities follow a "Regional Mexican format" featuring "different types of music from Mexico," which, according to the station's owners, "is popular throughout Mexico and has become a symbol of the entire country."

80.    Casas Baratas pays for a regular advertisement on FM 107.1 and much more. To exploit the station's deep connection with the Latino community, Casas Baratas also advertises on the station's website. Its web advertisement displays its trade dress –  Mexican flag colors, a cactus, sombreros – and a cartoon house holding a shovel, hammer, and paint roller, surrounded by the Casas Baratas logo. Its FM 107.1 webpage also shows  two large ads on the left and right featuring rent-to-buy houses with the Casas Baratas logo over them.

81.    Casas Baratas enlists Radio Latina DJ Buchón as its on-air pitchman. *The Magic of Group Identity: How Predatory Lenders Use Minorities to Target Communities of Color*, 17 Geo. J. on Poverty L. & Pol'y 165(2010) (In a hostile or alien marketplace, same race pitchmen are especially effective at engaging marginalized consumers). Each Wednesday, Buchón plays an interview-format advertisement featuring Natalia Villanueva. The broadcast on Wednesday, November 29, 2017 – translated to English – is typical:

> Natalia Villanueva (NV):  We have several houses, we have been buying right now houses in communities, new houses, almost built in 2009-2011, at good prices. You can call us at 317-771-6941, or visit

us Monday through Friday in our office without a prior appointment at 2176 N Meridian.

DJ:  Well, there is the basic information and ready. Now that the Christmas season is coming, I think a very good option is to start planning. Have you noticed that the lawyer Pablo has always said, and many people have told me, that things in this country have always been tough; always when you cross as undocumented, with papers and if the documents expired, or whatever, in this country things always have been hard. The immigration laws have always been harsh for people who unfortunately behave badly, and are on bad terms. I think there is a lot to worry about.

NV:  That's right, I have several people who sometimes tell me: oh, I may be deported, so why should I buy a house. Anyway you are still here and you have to pay rent, and you are living in a house; you are investing. And if at any time you decide to leave, or for some circumstance of destiny, you have to return to your country, you can sell the house. It is an investment and it is where you are living; it is a good option and a good decision.

DJ:  That's right, and I believe that the best time to buy your house is always the time when you are financially ready.

NV:  Exactly.

DJ.:  When you find a good offer and a good company that helps you as in this case, Casas.

NV:  That's right, and remember, taxes are almost around the corner. We're almost receiving our reimbursements and we're working with all the people. You can start paying a little bit, and on tax season you can pay more and be up to date. Remember that we, Casas, are helping an organization to build houses in Mexico in the northern part of the country. This is not a lie, people can come every time or when they come to the office and they will find all the information we have about this organization.

DJ:  Your phone number, quickly, for people who want to communicate with you.

NV:  The number is 317-771-6941; that's my cell phone number. You can send me text messages too, or you can call 317-793-2272, or visit us Monday through Friday, 10:00 am to 6:00 pm, without an appointment at 2176 N Meridian.

DJ:  Thank you very much, Natalia. Thank you very much for coming here. Thank you and I'm going to a commercial break and I'm back with more music mixed in a few minutes here on Radio Latina 107.1, DJ Buchón mix with you until at 6 o'clock.

82.    Casas Baratas also spends heavily for Spanish language print advertisement. For the last two years, it has run a glossy, full page advertisement in every edition of CV Latina, a monthly publication claiming to be the "largest Hispanic written media in the states of Indiana and Ohio." Its recent advertisements include its trade dress – Mexican colors, cactus, sombreros – but also include, "NO Verificamos Crédito," (No credit verifications) and "NO Necesitas SSN" (Don't need SSN).

83.    Flush with cash, Welton also polished the Casas Baratas website. The site now coincides with the Casas Baratas trade dress – Mexican flag colors, cactus and sombreros – and features videos in Spanish with Villanueva, a customer testimonial, and a radio event featuring DJ Buchón. Several pages are stamped with the Casas Baratas tag-line: "No Credito," and "NO Necesitas SSN."

84.    Casas Baratas also uses Facebook to post advertisements about its rent-to-buy houses. Starting in 2017, its Facebook page featured more sophisticated content, including a video showing an open house event, hosted by Radio Latina DJ Buchon who introduces Casas employees and one person purporting to be a satisfied customer. All content is in Spanish.

85.    Casas Baratas also encourages customers to recruit their friends and family to contact Villanueva about rent-to-buy houses, providing them with a range of handouts that employ the company's trade dress; for example:



86.    As the plaintiffs' individual stories tell, Casas Baratas' advertisement campaign has been devastatingly effective.

## H.  The American Dream Care Of Casas Baratas Aqui.

### 1.  Lizeth Azcarraga

87.    Plaintiff Lizeth Azcarraga, a monolingual Spanish speaker, occupies a house located at 65 South Lynhurst  Drive pursuant to a rent-to-buy agreement with defendants. On June 27, 2017, Azcarraga executed a one-year lease with SLB Acquisitions LLC for the rental of the Lynhurst house. The English-only lease set the monthly rental rate at $800 and contained each of the unlawful and void provisions described in paragraphs 57 through 63 above. On the same date, Azcarraga executed a related purchase option agreement. That English-only agreement offered to sell the Lynhurst house to Azcarraga for the sum of $84,900.00 pursuant to a land contract. The home sale was subject, however, to

Azcarraga's payment of an additional sum – variously described as an option fee or down payment – in the amount of $8,500 due before expiration of her one-year lease. The purchase option agreement contained each of the unlawful and void provisions described in paragraphs 64 through 67 above. The sales price represented a 140% markup from the $35,500.00 price that Welton had paid for the house a few days before on June 16, 2017.

88.    The entire transaction on June 27, 2017, took less than twenty minutes – just enough time for Villanueva – speaking in Spanish as one Latina to another – to convince Azcarraga to sign the English-only documents. Villanueva collected no information from Azcarraga or any other known source regarding Azcarraga's ability to pay the option or the promised land contract, or proof that Azcarraga had obtained credit counseling before executing the English-only documents presented by Villanueva.

89.    At no time – before or since June 27, 2017 – has any defendant ever provided Azcarraga with any written disclosure or notice in any language regarding the condition of the South Lynhurst house, the terms of the promised land contract, anything resembling a loan disclosure statement, a lawful rental agreement, a written appraisal of the house, or any subordination assurance. Except for the lease and purchase option, described above, the only other document provided to Azcarraga – and the only Spanish-language document ever

provided to her by defendants – is a one-page sheet instructing Azcarraga how to pay her money to defendants.

90.     Defendants lured Azcarraga into contacting Villanueva at Casas Baratas through word of month in the Latino community. Azcarraga called Villanueva, who directed her to view the house at 65 South Lynhurst  Drive. Although Azcarraga was unable to access the interior of the house, she was excited by the prospect of home ownership and agreed to meet with Villanueva on June 27 to discuss Casas' rent-to-buy offer, which Villanueva convinced Azcarraga was a good deal. Villanueva told Azcarraga that the Lynhurst house was ready for her occupancy as a dwelling.

91.     Azcarraga appreciated that the house would need work to transform it into family home for her daughters, and Azcarraga was not afraid of hard work. She left Mexico at age 17 to join her mother and brother in Indianapolis and, since her arrival, has worked as a commercial house painter, picking up extra work on the weekends to make ends meet.

92.     Azcarraga moved in August to the Lynhurst house with her two minor daughters. Contrary to Villanueva's representations, the house was unfit for human habitation, Ind. Code §16-41-20-1, and in a state of abandonment, Ind. Code §32-30-10.6-5. The kitchen and bathroom pipes burst. The laundry room flooded. The dishwasher was broken; the garage door was so rotten that it required replacement. The interior walls formed cracks as fast as Azcarraga could patch

them. The electrical fixtures were uncovered or broken. The family lived without a working shower for weeks because Azcarraga paid her wages to Casas Baratas instead of to a plumber to fix the bathroom.

93.     Azcarraga reported these defects to Villanueva and requested that they be repaired. Villanueva told Azcarraga that problems with the house were Azcarraga's problem. Nonetheless, Azcarraga continues to pay her rent and has paid $3,500 toward the down payment for the house. Since defendants have refused to fix the uninhabitable conditions in the house, Azcarraga has paid over $2,000 to contractors and for supplies to fix these defects herself.

### 2. Nicole Anaya

94.     Raised in Puerto Rico, plaintiff Nicole Anaya's principal language is Spanish; her comprehension of written English is very limited. Anaya occupies a house located at 1437 South Kiel Avenue in Indianapolis pursuant to a rent-to-buy agreement with defendants. On November 21, 2016, Anaya executed a lease with option to purchase with defendant Burger Property Assurance LLC for the rental of the Kiel house. The English-only lease set the monthly rental rate at $500 and contained each of the unlawful and void provisions described in paragraphs 57-63 above. It also offered to sell the house to Anaya for the sum of $54,900.00, subject to payment of a non-refundable fee of $5,500 due by February 14, 2017. The purchase option provisions of this document contained most of the unlawful and void provisions described in paragraphs 64-67 above. The sales price represented

a 670% markup from the $7,500 price that Charles Gillman, principal of defendant Wong Ventures, LLC, had paid for the house in 2012. (There is no record that the property was owned by Burger Property Assurance LLC.)

95.    The entire November 21, 2016, transaction took less than fifteen minutes – just enough time for Villanueva – speaking in Spanish as one Latina to another – to convince Anaya to sign the English-only documents. Villanueva collected no information from Anaya or any other known source regarding Anaya's ability to pay the option or the promised land contract or proof that Anaya had obtained credit counseling before executing the English-only documents presented by Villanueva.

96.    At no time – before or since November 21, 2016– has any defendant ever provided Anaya with any written disclosure or notice in any language regarding the condition of the South Kiel house, the terms of the promised land contract, anything resembling a loan disclosure statement, a lawful rental agreement, a written appraisal of the house, or any subordination assurance. Except for the lease and purchase option, described above, the only other document provided to Anaya – and the only Spanish-language document ever provided by defendants – is a one-page sheet instructing Anaya how to pay her money to defendants.

97.    Defendants lured Anaya into contacting Villanueva at Casas Baratas through its ubiquitous Renta-A-Compra signage. Of the Casas houses Anaya

viewed, she liked the South Kiel house best. Although Anaya observed that the Kiel house was very dirty and neglected, she was excited by the prospect of home ownership. Villanueva made rent-to-buy sound like a great deal, especially since Villanueva had informed her that the house was ready for occupancy as a dwelling.

98.    Anaya appreciated that the house needed work. She understood that it was her responsibility to improve the property, but nothing prepared her for house's uninhabitable conditions. Contrary to Villanueva's representations, the house was unfit for human habitation, Ind. Code §16-41-20-1, and in a state of abandonment, Ind. Code §32-30-10.6-5. The furnace failed to function. None of the bathroom plumbing worked. The two broken windows that Villanueva had agreed to fix were never repaired. The interior doors were broken, warped or missing. The floor buckled, caused by mold embedded in the carpet. Anaya knew the carpet would have to be replaced, but did not suspect that the problem had infected the floors. The cabinets also required replacement.

99.    Anaya reported these defects to Villanueva and requested that they be repaired. Villanueva told Anaya that problems with the house were Anaya's problem. Nonetheless, Anaya continues to pay her rent and has paid $3,500 toward the down payment for the house. Since defendants have refused to fix the uninhabitable conditions in the house, Anaya has paid over $15,000 toward making the home habitable.

### 3. *Romary Vazquez*

100.   Raised in Puerto Rico, plaintiff Romary Vazquez's principal language is Spanish; her comprehension of written English is very limited. Vazquez occupies a house located at 6 Mellon Court in Indianapolis pursuant to a rent-to-buy agreement with defendants. On April 24, 2017, Vazquez executed a one-year lease with SLB Acquisitions LLC for the rental of the Mellon house. The English-only lease set the monthly rental rate at $800 and contained each of the unlawful and void provisions described in paragraphs 57-63 above. On the same date, Vazquez executed a related purchase option agreement. That English-only agreement offered to sell the Mellon house to Vazquez for the sum of $89,900.00 pursuant to a land contract. The home sale was subject, however, to Vazquez's payment of an additional sum – variously described as an option fee or down payment – in the amount of $9,000 due prior to expiration of her one-year lease. The purchase option agreement contained each of the unlawful and void provisions described in paragraphs 64-67 above. The sales price represented a 157% markup from the $35,001.00 price that Welton had paid for the house two months before in February 2017.

101.   The entire April 24, 2017, transaction took less than twenty minutes – just enough time for Villanueva – speaking in Spanish as one Latina to another – to convince Vazquez to sign these English only documents. Villanueva collected no information from Vazquez or any other known source regarding Vazquez's

ability to pay the option or the promised land contract or proof that Vazquez had obtained credit counseling before executing the English-only documents presented by Villanueva.

102.    At no time – before or since April 24, 2017 – has any defendant ever provided Vazquez with any written disclosure or notice in any language regarding the condition of the South Mellon house, the terms of the promised land contract, anything resembling a loan disclosure statement, a lawful rental agreement, a written appraisal of the house, or any subordination assurance. Except for the lease and purchase option, described above, the only other document provided Vazquez – and the only Spanish-language document ever provided by defendants – is a one-page sheet instructing Vazquez how to pay her money to defendants.

103.    Defendants lured Vazquez into contacting Villanueva at Casas through word of month in the Latino community. Vazquez visited Villanueva at the Casas Baratas office where Villanueva provided Vazquez with several houses to view by texting her a list of houses. The best of the bunch was the Mellon house. Although Vazquez observed that the carpet in the Mellon house was very dirty and required replacement, she was excited by the prospect of home ownership. Villanueva made rent-to-buy sound like a great deal, especially since the house was ready for occupancy as a dwelling, according to Villanueva.

104.    Vazquez moved immediately into the Mellon house and discovered, contrary to Villanueva's representations, the house was unfit for human habitation,

Ind. Code §16-41-20-1, and in a state of abandonment, Ind. Code §32-30-10.6-5. She immediately complained to Villanueva, reporting that the plumbing was completely clogged, the sink did not function, the floor appeared to suffer from rot, and the ceiling had started to collapse. Vazquez complained repeatedly to Villanueva in person and by text in May, June, September, November and December about the house's uninhabitable condition.

105.   Villanueva relented to Vazquez's complaints at one point, sending a crew of men to the house to dig a big hole in the front yard. They never found, let alone fixed, the damaged pipes and left the hole uncovered, forcing Vazquez and her husband to fill the hole themselves. Villanueva then sent a crew to fix the ceiling, but instead of fixing it they sprayed fiberglass particles throughout the house. When Vazquez complained the next time, Villanueva sent her husband, defendant Juan Enriquez, who threatened Vazquez. Enriquez told Vazquez to stop complaining because her complaints would do no good. He told Vazquez that Casas Baratas' owner was "untouchable," and worse, people who complained need to be careful since they are "illegal."

106.   After Enriquez's visit, Vazquez was afraid to complain and still fears retaliation by defendants. Vazquez and her husband have renovated the house themselves. In addition to paying their rent and $7,000 of the down payment, they have invested more than $10,000 in repairs and improvements to the home.

//

### 4. Sarahi Guadarrama

107.   Plaintiff Sarahi Guadarrama, a monolingual Spanish speaker, occupies a house located at 3237 Gerrard Avenue pursuant to a rent-to-buy agreement with defendants. On June 28, 2017, Guadarrama executed a one-year lease with SLB Investments LLC for the rental of the Gerrard house. The English-only lease set the monthly rental rate at $750 and contained each of the unlawful and void provisions described in paragraphs 57-63 above. On the same date, Guadarrama executed a related purchase option agreement. That English-only agreement offered to sell the Gerrard house to Guadarrama for the sum of $84,900.00 pursuant to a land contract. The home sale was subject, however, to Guadarrama's payment of an additional sum – variously described as an option fee or down payment – in the amount of $8,500 due prior to the expiration of her one-year lease. The purchase option agreement contained each of the unlawful and void provisions described in paragraphs 64-67 above. The sales price represented a 129% markup from the $37,073.00 price that Welton had paid for the house three months before in March 2017.

108.   The entire June 18, 2017, transaction took only minutes and was conducted in Spanish although the documents signed were in English only. Villanueva collected no information from Guadarrama or any other source regarding Guadarrama's ability to pay the option or the promised land contract, or proof that Guadarrama had obtained credit counseling.

109.   At no time – before or since April 28, 2017 – has any defendant ever provided Guadarrama with any written disclosure or notice in any language regarding the condition of the South Gerrard house, the terms of the promised land contract, anything resembling a loan disclosure statement, a lawful rental agreement, a written appraisal of the house, or any subordination assurance. Except for the lease and purchase option, described above, the only other document provided Guadarrama – and the only Spanish-language document ever provided by defendants – is a one-page sheet instructing Guadarrama how to pay her money to defendants.

110.   Defendants lured Guadarrama into contacting Villanueva at Casas Baratas through word of month in the Latino community. Guadarrama called Villanueva who directed her to view the house at 65 South Gerrard  Drive. Although Guadarrama was unable to access the interior of the house, she was excited by the prospect of home ownership and agreed to meet with Villanueva on June 27 to discuss Casas' rent-to-buy offer, which Villanueva convinced Guadarrama was a good deal and that the Gerrard house was ready for her occupancy as a dwelling.

111.   Guadarrama understood that any improvements to the house were her responsibility, but nothing prepared her for the conditions she found inside the home. Contrary to Villanueva's representations, the house was unfit for human

habitation, Ind. Code §16-41-20-1, and in a state of abandonment, Ind. Code §32-30-10.6-5.

112.    The city cited the house for gas leaks on September 5, and for electrical defects on September 6. On November 1, the city returned, citing the house for an inoperative furnace. There were other problems as well, ranging from an exterior door that failed to close to exterior rot.

113.    Finally, Guadarrama had had enough and with the help of Neighborhood Christian Legal Clinic sued the owners for breach of the implied warranty of habitability and failure to make repairs.  Grover Davis answered and counterclaimed on behalf of the owners and, eventually, settled the case.

### 5. *Paula Almanza*

114.    Plaintiff Paula Almanza, a monolingual Spanish speaker, occupies a house located at 1601 North Pasadena Street pursuant to a land contract for purchase with defendants, one of the early land contracts that Welton executed with a Latino family. On April 30, 2014, Almanza executed a lease with option to purchase with Hoosier Collins Commercial Strategies LLC for the rental of the North Pasadena Street house. The English-only lease set the monthly rental rate at $1,000 and contained each of the unlawful and void provisions described in paragraphs 57-63 above. It also offered to sell the house to Almanza for the sum of $77,900.00, subject to payment of a nonrefundable fee of $8,500. The purchase option provisions of this document contained most of the unlawful and void

provisions described in paragraphs 64-67 above. The sales price represented a 140% markup from the $32,401.00 price that Welton had paid for the house a few months before in March 2014.

115.    Almanza paid the down payment and executed an English-only land contract with defendants on November 28, 2014. The loan terms under the contract acknowledge receipt of the down payment and further provide:

> $69,400.00 shall be paid to Vendor (Welton) by Purchaser (Almanza), together with interest at the rate of ten percent (10 %) per annum ("Per Annum Rate"), with interest at the Per Annum Rate on the unpaid Contract Balance as herein provided, in equal monthly installments of Seven Hundred Forty Six and 00/100 Dollars ($746.00) per month, which installment payments shall commence on December 1, 2014, and shall continue on the 1st day of each successive calendar month thereafter, until 358 months (30 years).

116.    Almanza recorded the land contract on December 8, 2014.

117.    Both transactions – execution of the lease with purchase option and land contract – took less than twenty minutes, just enough time for Villanueva – speaking in Spanish – to convince Almanza and her husband to sign these English only documents. Villanueva collected no information from Almanza or any other known source regarding Almanza's ability to pay the option or the promised land contract, or proof that Almanza had obtained credit counseling before executing the English-only documents presented by Villanueva.

118.    At no time in connection with either transaction did any defendant ever provided Almanza with any written disclosure or notice in any language regarding the condition of the North Pasadena Street house, the terms of the promised land contract, anything resembling a loan disclosure statement, a lawful rental agreement, a written appraisal of the house, or any subordination assurance.

119.    After many repairs and improvements, the North Pasadena Street house has increased in value and Almanza wants to keep the house as her familial home. But she fears that Welton will not honor his pledge to convey the house to her at the conclusion of the land contract. She worries that Welton will try to increase the price or take the house that she has worked so hard to improve.

### 6. *Jorge Caceres*

120.    Plaintiff Jorge Caceres, a monolingual Spanish speaker, occupies a house located at 473 South Somerset Avenue pursuant to a land contract for purchase with defendants. On May 10, 2017, Caceres executed a one-year lease with SLB Acquisitions LLC for the rental of the Somerset house. The English-only lease set the monthly rental rate at $800 and contained each of the unlawful and void provisions described in paragraphs 57-63 above. On the same date, Caceres executed a related purchase option agreement. That English-only agreement offered to sell the Somerset house to Caceres for the sum of $78,000.00 pursuant to a land contract. The home sale was subject, however, to Caceres's payment of an additional sum – variously described as an option fee or down

payment – in the amount of $9,000 due prior to the expiration of the one-year lease. Caceres paid the down payment in full on May 10, the same day he executed the lease and purchase option agreement. The purchase option agreement contained each of the unlawful and void provisions described in paragraphs 64-67 above. The sales price represented a 140% markup from the $32,500.00 price that Charles Gillman had paid for the house in May 2013 and later transferred to one of Welton's LLCs.

121.    The English-only land contract executed between Caceres and Welton on June 15, 2017 acknowledges  receipt of the down payment and further provides:

> $69,000.00 shall be paid to Vendor (Welton) by Purchaser (Caceres), together with interest at the rate of Ten percent ( 10 %) per annum ("Per Annum Rate"), with interest at the Per Annum Rate on the unpaid Contract Balance as herein provided, in equal monthly installments of Eight Hundred Twenty Five 00/100 Dollars ($825.00) per month, which installment payments shall commence on June 15th, 2017, and shall continue on the 1st day of each successive calendar month thereafter, until 144 months or 12 years the Contract Balance and all accrued interest thereon has been paid in full.

122.    Welton has failed or refused to record Caceres's land contract.

123.    These transactions – execution of the lease, purchase option agreement, and land contract – took less than thirty minutes, just enough time for Villanueva – speaking in Spanish – to convince Caceres to sign these English-only documents. Villanueva collected no information from Caceres or any other known

source regarding Caceres's ability to pay the option or the promised land contract or proof that Caceres had obtained credit counseling before executing the English-only documents presented by Villanueva.

124.   At no time in connection with any of these three transactions did any defendant ever provided Caceres with any written disclosure or notice in any language regarding the condition of the South Somerset house, the terms of the promised land contract, anything resembling a loan disclosure statement, a lawful rental agreement, a written appraisal of the house, or any subordination assurance.

125.   Contrary to Villanueva's representations, the house was unfit for human habitation, Ind. Code §16-41-20-1, and in a state of abandonment, Ind. Code §32-30-10.6-5.  Caceres has poured more than $15,000 of his own money into fixing and improving the house. After many repairs and improvements, the Somerset house has increased in value and Caceres wants to keep the house as his familial home. But he fears that Welton will not honor his pledge to convey the house to him at the conclusion of the land contract. He worries that Welton will try increase the price or take the house that his family has worked so hard to improve.

## I. Discriminatory Practices

126.   On their face and as applied, defendants' practices and misconduct violate federal and state consumer protection laws. They also violate federal anti-discrimination laws in two ways.

127.    First, defendants focus their predatory practices and related misconduct based on national origin, race and color by targeting Indianapolis's Latino community, including plaintiffs. That targeting is highly calculated and intentional and thus discriminatory, an example of disparate treatment based on national origin, race or color that violates the Fair Housing Act, Equal Credit Opportunity Act, and Civil Rights Act of 1866 and 1871.

128.    Second, defendants' predatory practices have a disparate impact on Indianapolis's Latino community, including plaintiffs. Even if the Court were to assume that defendants' practices were executed in a race-neutral manner, the adverse effect of those practices fall more harshly on Indianapolis's Latino community, including plaintiffs, an example of disparate impact based on national origin, race or color that violates the Fair Housing Act and Equal Credit Opportunity Act.

### J.  Injuries

129.    As a result of defendants' unlawful acts and practices, Azcarraga, Anaya, Vazquez, Almanza, Guadarrama, and Caceres (individual plaintiffs) have suffered loss of the value, use and enjoyment of their property, loss of current and future income, deprivation of important housing opportunities, and emotional distress, including humiliation, embarrassment, disappointment, frustration and attendant bodily injuries. Accordingly, each individual plaintiff is entitled to compensatory damages.

130.   Defendants' unlawful and discriminatory conduct also injured the Fair Housing Center, causing it to divert its scarce resources and frustrating its mission. To counteract defendants' discriminatory housing practices, the Fair Housing Center has diverted several hundred hours of staff time from other projects in order to investigate defendants. Its staff has interviewed more than 50 witnesses, counseling dozens of victims injured by defendants' predatory practices, collecting and analyzing tens of thousands of public records, and launched an outreach program aimed at educating low-income home seekers how to avoid discriminatory and predatory practices committed by defendants. Accordingly, the Center seeks compensatory damages under the Fair Housing Act.

131.   Defendants committed each of the unlawful and discriminatory practices alleged in this complaint with reckless disregard of the rights of each plaintiff. Accordingly, each plaintiff seeks punitive damages pursuant to their federal claims only.

132.   There now exists an actual controversy between the parties regarding duties under federal and state laws. Accordingly, each plaintiff is entitled to declaratory relief under their federal and state law claims including, but not limited to, 28 U.S.C. § 2201 as well as Rule 57 of the Federal Rules of Civil Procedure.

133.   Unless enjoined, defendants will continue to engage in the unlawful acts and the pattern or practice of discrimination described in this complaint.

Plaintiffs have no adequate remedy at law. Plaintiffs are now suffering and will continue to suffer irreparable injury from defendants' misconduct unless relief is provided by this Court. Accordingly, each plaintiff is entitled to injunctive relief under their federal and state law claims including, but not limited to, 28 U.S.C. § 2202 as well as Rule 65 of the Federal Rules of Civil Procedure.

## V.  CLAIMS

### A.  First Claim
### Fair Housing Act
### (42 U.S.C. § 3601, *et seq.*)

134.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

135.   Each defendant injured each plaintiff by committing discriminatory housing practices based on disparate treatment or disparate impact in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a), 3604(b), 3604(c), 3604(d), 3605, 3606, and 3617.

### B.  Second Claim
### Equal Credit Opportunity Act
### (15 U.S.C. § 1691, *et seq.*)

136.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

137.   Each defendant in their capacity as "creditors," 15 U.S.C. § 1691a(e), injured each individual plaintiff in their capacity as "applicants," 15 U.S.C. § 1691a(b), by committing unlawful acts and practices with respect to "credit transactions," 15 U.S.C. § 1691(a)(1), for the purpose or with the effect of discriminating on the basis of race, color or national origin in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 and its implementing regulation, 12 C.F.R. § 1002.

### C.  Third Claim
### Civil Rights Act of 1866
### (42 U.S.C. § 1981)

138.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

139.   Each defendant injured each individual plaintiff by impairing his or her right – as enjoyed by white citizens –in the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

//

//

//

### D.  Fourth Claim
### Civil Rights Act of 1871
### (42 U.S.C. § 1985(3))

140.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

141.    Each defendant injured each individual plaintiff in his or her person or property by –

a.  conspiring to deprive them, based on his or her race, national origin, or color, of equal protection of laws; and,

b.  each defendant caused acts in furtherance of the object of that conspiracy,

in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985(3).

### E.  Fifth Claim
### Truth in Lending Act
### (15 U.S.C. § 1601, *et seq.*)

142.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

143.    Each defendant in their capacity as "creditors," 12 C.F.R. § 1026.2(a)(17), injured each individual plaintiff in their capacity as "consumers,"

15 U.S.C. § 1602, 12 C.F.R. § 1026.2, by engaging in "higher-priced covered transactions," 12 C.F.R. § 1026.43(b)(4), and –

    a.  by failing or refusing to make a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms, in violation of 15 U.S.C. § 1639c(a) and 12 C.F.R. § 1026.43(c);

    b.  by failing or refusing to receive written certification that the consumer has obtained counseling on the advisability of the transaction from an appropriate counselor, in violation of 15 U.S.C. § 1639(u) and 12 C.F.R. § 1026.34(a)(5);

    c.  by failing or refusing to provide a disclosure stating: "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan," in violation of 15 U.S.C. § 1639(a) and 12 C.F.R. § 1026.32(c); and,

    d.  by failing or refusing to provide the consumer with a written appraisal performed by a certified or licensed appraiser in violation of 15 U.S.C. § 1639h and 12 C.F.R. § 1026.35(c)(6)

– in violation of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*

## F.  Sixth Claim
## Residential Real Estate Sales Disclosure Statute
## (Ind. Code §32-21-5-1)

144.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

145.    Defendants Welton, Villanueva, and LLCs contracting with plaintiffs – SLB Acquisitions LLC,  Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – in their capacity as "owners," I.C. §32-21-5-6, injured each individual plaintiff in their capacity as a "buyer," I.C. §32-21-5-2, –

a.  by failing or refusing to provide each plaintiffs with a "disclosure form," I.C. §§32-21-5-5, 32-21-5-8, before the "closing," I.C. §§32-21-5-3, 32-21-5-10, of each plaintiff's "lease with option to buy residential real estate," I.C. §32-21-5-1, and,

b.  by failing or refusing to identifying the dwelling's "defects," I.C. §32-21-5-4, involving the foundation, roof, mechanical, water and sewer systems and other mandatory disclosures, I.C. §32-21-5-7

– in violation of the Residential Real Estate Sales Disclosure Statute, I.C. §32-21-5-1.

-54-

## G.  Seventh Claim
## Landlord - Tenant Relations Statute
## (Ind. Code §32-31)

146.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

147.    Defendants Welton and LLCs contracting with plaintiffs – SLB Acquisitions LLC,  Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – in their capacity as "landlords," I.C. §32-31-3-3, and "owners," I.C. §32-31-3-4, injured each individual plaintiff, except for Guadarrama, in their capacity as "tenants," I.C. §32-31-3-10 –

a.  by knowingly failing or refusing to deliver dwellings to plaintiffs in a "safe, clean, and habitable condition," I.C. §32-31-8-5(1), in compliance with "all health and housing codes," I.C. §32-31-8-5(2); and

b.  by knowingly failing or refusing to provide and maintain – throughout plaintiffs' occupancy – the dwelling's electrical, plumbing, sanitation, heating, ventilation and cooling systems in "good and safe working condition," I.C. §32-31-8-5(4)

– in violation of Indiana Landlord - Tenant Relations Statute.

//

//

## H.  Eighth Claim
## First Lien Mortgage Lending Act
## (Ind. Code §24-4.4)

148.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

149.    Defendants Welton and LLCs contracting with plaintiffs – SLB Acquisitions LLC,  Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – in their capacity as "creditors," I.C. §24-4.4-1-301(7), who are "regularly engaged," I.C. §24-4.4-1-301(38), in a "loan brokerage business," I.C. §24-4.4-1-301(19), for the purpose of making "loans," I.C. §24-4.4-1-301(18)(a)(ii), that are "secured by mortgage or land contract," I.C. §24-4.4-1-301(14), injured each plaintiff –

a.  by failing or refusing to comply with the disclosure requirements of the Consumer Credit Protection Act (15 U.S.C. § 1601), I.C. §24-4.4-2-202, including the right to rescind the transaction, I.C. §24-4.4-2-502;

b.  by failing or refusing to obtain and comply with licensure requirements, I.C. §24-4.4-2-401, intended to protect members of the public, such as plaintiffs, from the unlawful conduct alleged in this complaint; and,

c.  by failing or refusing to obtain and maintain a surety bond, I.C. §24-4.4-2-402.3, intended to protect members of the public for the type of unlawful conduct alleged in this complaint

– in violation of Indiana's First Lien Mortgage Lending Act.

## I.  Ninth Claim
## Consumer Credit Disclosures
### (Ind. Code §24-2.5)

150.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

151.  Defendants Welton and LLCs contracting with plaintiffs – SLB Acquisitions LLC,  Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – in their capacity as "creditors," I.C. §24-4.5-5-203(b)(8), and "sellers," I.C. §24-4.5-2-107, engaged in the "sale of an interest in land," I.C. §24-4.5-2-105(6), injured each individual plaintiff –

a.  by failing or refusing to comply with the disclosure requirements of the Consumer Credit Protection Act (15 U.S.C. § 1601), I.C. §24-4.4-2-202, including the right to rescind the transaction, I.C. §24-4.4-2-502;

b.  by failing or refusing to obtain and comply with licensure requirements, I.C. §24-4.4-2-401, intended to protect members of the public, such as plaintiffs, from the unlawful conduct alleged in this complaint;

c.  by imposing unlawful fees, costs, and charges in excess of statutory limits, e.g., I.C. §24-4.5-2-202(d) and I.C. §24-4.5-2-203.5(1), or lacking any reasonable relationship to seller's costs, e.g., I.C. §24-4.5-2-202(e);

d.  by employing multiple agreements to circumvent state consumer law

protections, e.g., I.C. §24-4.5-2-402; and,

e.  by imposing liability on consumers in the form of forfeited option

fees or down payments in excess of statutory limits, e.g., I.C. §24-4.5-2-406

– in violation of Indiana's Consumer Credit Act.

### J.  Tenth Claim
### Real Property Improvement Supplier Statute
### (Ind. Code §24-5-11-14)

152.    Plaintiffs reallege and incorporate by reference all preceding
paragraphs alleged herein.

153.    Defendants Welton, Villanueva, Enriquez and SLB Acquisitions LLC
in their capacity as "real property improvement suppliers," I.C. §24-5-11-6,
injured Vazquez in her capacity as a "consumer," I.C. §24-5-11-2 –

a.  by failing or refusing to provide Vazquez with a "complete real property

improvement contract," I.C. §§24-5-11-4, 24-5-11-10, in the course of

soliciting or prior to performing "real property improvement," I.C.

§24-5-11-3, upon plaintiff's dwelling, I.C. §24-5-11-7.5; and,

b.  by committing an "incurable deceptive act," I.C. §24-5-0.5-4

– in violation of the Real Property Improvement Supplier Statute, I.C. §24-5-11-14.

### K.  Eleventh Claim
### Deceptive Consumer Sales
### (Ind. Code §24-5-11-05)

154.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

155.   Defendants Welton and LLCs contracting with plaintiffs – SLB Acquisitions LLC,  Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – in their capacity as "suppliers," I.C. §24-5-0.5-2(a)(3), engaged in "consumer transactions," I.C. §24-5-0.5-2(a)(1), injured each individual plaintiff –

a.  by committing "incurable deceptive acts," as defined by I.C. §§24-5-0.5-2(a)(8) and 24-5-0.5-3(a)(8), by misrepresenting the rights, remedies and obligations they and the consumers have pursuant to their respective lease-option contracts in furtherance of a scheme and artifice with the intent to mislead those consumers;

b.  by soliciting to "engage in a consumer transaction without a permit or other license required by law," I.C. §24-5-0.5-10(a)(1); or,

c.  by committing "unconscionable acts," including soliciting a person to enter into a contract or agreement  that contains "terms that are oppressively one sided or harsh," or in which "terms unduly limit the person's remedies" or impose a price term that is "unduly excessive," I.C. §24-5-0.5-10(b)

– in violation of Indiana's Consumer Sales Act.

## L.  Twelfth Claim
## Occupying Claimant Statute
## (Ind. Code §32-30-3)

156.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

157.   Defendants Welton and LLCs contracting with plaintiffs – SLB Acquisitions LLC,  Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – injured each individual plaintiff in their capacities as "occupants of real estate," I.C. §32-30-3.1, with legal or equitable "color of title to that property," I.C. §32-30-3.8, and the status of "purchasers," I.C. §§32-30-3.1-7, 32-30-3.1-8 –

a.  by failing or refusing to pay each plaintiff the "value of the improvements made by each plaintiff to the real property," I.C. §32-30-3.1-2, and,

b.  by failing or refusing to reimburse each plaintiff the sums paid for "taxes, including interest," I.C. §32-30-3.1-2

– in violation of Indiana's Occupying Claimant Statute, Ind. Code Chap. 32-30-3.1.

## M.  Thirteenth Claim
## Quiet Title
## (Ind. Code §32-30-2-1)

158.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

159.    Each individual plaintiff – having a valid subsisting interest in real estate and a right of possession of real estate, I.C. §32-30-2-1, is entitled to quiet title against defendants Welton and LLCs contracting with plaintiffs – SLB Acquisitions LLC,  Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – based on the following:

a.  That each individual plaintiff is entitled to the possession of his or her dwelling, as described in this complaint;

b.  That each individual plaintiff is entitled to the quiet and secure possession of their dwellings pursuant to a transaction that provides each with title to the property, subordinate to no others, and subject to an equitable mortgage securing their payment of the dwelling's fair market

value and charging an interest rate that is less than the threshold for "higher-priced covered transactions," 12 C.F.R. § 1026.43(b)(4);

c.  That defendants – through their discriminatory, deceptive and wrongful conduct – unlawfully keep the individual plaintiffs from quiet and secure possession of their dwellings; and,

d.  That defendants – through their discriminatory, deceptive and wrongful conduct – unlawfully exploit the individual plaintiffs' interest in their dwellings in a reckless manner to gain unlawful profits.

In addition, each individual plaintiffs entitled to an award of damages for the derogation of plaintiffs' property rights, I.C. §32-30-1, *et seq.*

## N.  Fourteenth Claim
## Nuisance
## (Ind. Code §32-30-2-1)

160.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

161.    Defendants Welton, Villanueva, and LLCs contracting with plaintiffs – SLB Acquisitions LLC, Burger Property Assurance LLC, SLB Investments LLC, and Hoosier Collins Commercial Strategies LLC – injured each individual plaintiff by committing a "nuisance," I.C. §32-30-6-6, that –

a. injuriously affected each individual plaintiff's property, I.C. §32-30-6-7(a)(1); or,

b. lessened the personal enjoyment of each individual plaintiff

– in violation of their statutory right to the quiet use and enjoy of their property, I.C. §32-30-6, *et seq.*

## VI. PRAYER

Wherefore, plaintiffs pray for entry of a judgment that:

1. Awards compensatory damages;

2. Awards statutory damages the full extent permitted under federal or state laws;

3. Awards punitive damages under plaintiffs' federal claims only;

4. Awards temporary, preliminary and final injunctive relief to end defendants' discriminatory housing practices and require defendants to take affirmative steps to counteract and cure their unlawful and discriminatory practices;

5. Declares under 28 U.S.C. § 2201 that the defendants have violated the applicable federal and related state laws;

6. Awards reasonable attorneys' fees and costs; and

7.    Awards any other relief deemed just by the Court.

## VII.  JURY DEMAND

Plaintiffs demand trial by jury.

*   *   *

Dated: April 10, 2018.

Respectfully submitted,

GOODIN ABERNATHY LLP
    Christopher Clark (18577-29)
    cclark@goodinabernathy.com
301 E. 38th Street
Indianapolis, Indiana 46205
Tel: (317) 843-2606
Fax: (317) 574-3095

BRANCART & BRANCART

*/s/ Christopher Brancart*
Christopher Brancart (CA128475)
cbrancart@brancart.com
Post Office Box 686
Pescadero, CA 94060
Tel: (650) 879-0141
Fax: (650) 879-1103

NEIGHBORHOOD CHRISTIAN
LEGAL CLINIC, INC.

    Chase Haller (29944-49)

    challer@nclegalclinic.org

3333 North Meridian Street, Suite 201,
Indianapolis, IN 46208

Fax: (317) 429-4130

Tel: (317) 429-4131

Attorneys for Plaintiffs